The opinion of the court was delivered by
Duncan, J.
It is important to keep in view, that we have not, in this case, any bona fide purchaser of the original title, under the warrant of George Nixon; that it is held by a mere volunteer, claiming as the devisee of George Nixon, and that under the "warrant of four hundred acres, exclusive of Smith’s addition to M‘Pherson’s survey of one hundred and twenty-seven acres, there is now held by the Nixon family, or purchasers from him, under this fotfr hundred acre warrant, six hundred and eighty-seven acres. If this had heed a valid warrant, according to the usage of the land, office at that time, the survey of eight hundred and fourteen acres would have held the surplus, provided it did not interfere, when it was made, with the intervening rights of others. But, when *125 this survey was made, John Palmer had made a settlement, in the year 1760 or 1762, and conveyed the settlement right to J. Moore, who conveyed to Robert M‘Pherson, under whom the plaintiff claims, and who, on the 1st of August, 1766, the day on which the office opened on the new plan, by application, instead of warrant, entered his application, and obtained an order of survey for three hundred acres, including an improvement made by John Palmer, in 1762 or 1760. Now, if there was nothing more in the case than this, no room would be left to doubt, but that MiPher-son would have an unquestioned right to a reasonable survey of three hundred acres, in preference to Nixon’s warrant, even had it been valid, if his settlement was before the warrant; so that, if M‘Pherson-has lost his preference, it must be, because it has been forfeited by his own act's — laches and negligence. The warrant to George Nixon exhibits a very extraordinary aspect, and the court decided, “that no title was derived by Nixon under this warrant, because it was not signed by the governor, and because no purchase money nor fees had been paid;” and another reason might be added, that the warrant never was regularly, or irregularly, in the surveyor general’s office, until July, 1765; as appears by the entry endorsed on the warrant, “ brought into the surveyor general’s office, July, 1765.” So that, when the survey was made, it was made without authority or direction; and, though then brought into the office, it was not received and regularly filed in that office, but found enclosed — with other suspicious and irregular papers — in an old newspaper. Prima facie, the warrant was invalid; but this matter might have been explained. The holder of the warrant might have shown some particular reason for departure from the general rule; some special order of the proprietries; some previous, irregular authority; or, some subsequent ratification by acceptance, which would take effect from that subsequent act. But this was not shown; for, although the deputy is charged with the fees in the surveyor general’s books, and the surveyor endorsed it, this is entered in Richard Tea’s list of returns, made to the office of the surveyor general, of the 7th of March, 1767; but the old newspaper wrapper, containing them is endorsed, — “G. W. and Captain Little; no fees paid; received July, 1765.” So that the evidence is conclusive, that the warrant and survey were never in the surveyor general’s office, until July, 1765; and then not received and filed as regular office papers. There is something further extraordinary in this transaction: George Nixon is the brother-in-law of G. Woods, and, when the warrant was taken out, was not in America; and George Woods, on the 2d of March, 1764, claimed the land under a conveyance from George Nixon. The survey, whatever it was, was made for Richard Tea and Captain Little, who was the brother-in-law of George Woods. On the 19th of March, G. Woods conveyed it to R. Tea and John Little, the seventeenth day after the date of the conveyance from George Nixon to him. When the *126 survey was made, it was made by R. Tea, the claimant of Cr, Nixon’s title, for himself. It was in evidence, that in 1764, when the warrant issued, R. Tea was a clerk in the land office. When the location of MlPherson was put in the hands of R. Tea, then deputy surveyor, we know not; but, in 1769, a survey, as appears from a draft in the handwriting, with the calculation of Richard Tea, found in the surveyor’s office, was made for MiPher-son, on his application, of only one hundred and* fifty-two acres; On the order of survey, directed to R. Tea, there is endorsed, in. his handwriting, “ Executed by G. W., 14th of March, 1769.” Mr. Woods sometimes made surveys for R. Tea. It does not appear, that any further act was done by either party, until 1775, when the late Judge Smith, by the special direction of the surveyor general, made the addition, including the land in dispute. This order is without date, but the survey was made in April, 1775. Nixon began to build in 1775. He cleared no ground. He left it, and did not return until 1782. After Indian hostilities ceased, in 1794, a lease was given by M‘Pherson’s heirs, to one Riblet, who had a school house on the land, built by the neigh-bours, where Nixon's children went to school, Nixon then claiming the land. In 1814, Riblet had added to the first cabin, a small barn or still house, and cleared twenty or twenty-five acres of land in 1815. After Abraham Riblet’s death, his son Henry took a lease. Smith’s addition was not returned, until after the ejectment brought. On this statement of facts, granting, as the court did, that the warrant and survey of Nixon were void, and putting it to the jury, as was done in the charge, on the settlement of Nixon commenced in 1775, whether before or after the resurvey of Smith, was there error in the charge of the court? There can be no question made, but that MlPherson might, if he so chose, by his application, have taken a less quantity than three hundred acres; but if the land was of equal quality, as he had bought in Palmer’s settlement right, and took out an application for three hundred acres to fill that right, the first presumption is, that he intended to take in three hundred acres. I find the law no where laid down with more clearness, than in the charge of Judge Smith, in Davis’s Lessee v. Keefer, 4 Rinn. 163. He says, “ I agree, that every settler is entitled to three hundred acres, if there be so much unappropriated land connected to his settlement; but he may take less, and, if he does take a warrant for less than his settlement entitled him to, and has it fairly and duly surveyed, and without any fraud, deception, or misrepresentation, by an adverse warrantee, he is bound to that quantity; and he cannot, after another person has obtained a warrant for the adjoining land, take out a subsequent warrant for it. This is the settled rule of law, and it is necessary to adhere to it.” So, if one takes out a warrant for a full settlement right, but does not fill it, and he chooses not to fill it, and has his survey fairly made and returned, he cannot, *127 at any time afterwards, not barred by the act of limitations, if a third person had taken out a right, or settled on the part left out, by a new survey, oust such such person. Now, in 1769, was there any thing to prevent Tea, except his own invalid survey, on Nixon’s invalid warrant, made for himself, from filling the location of M‘Pherson ? If he was the agent of MlPherson, to make his survey, and he was his agent for the particular purpose of laying the location according to its description, and, at the same time, had an adverse interest not to fill it, and omitted to fill it for that reason, then he deceived M‘Pherson; and, as Nixon claimed under that deceptive act of Tea, and had the benefit of it, and as McPherson might believe that his survey had been duly made, and make no further inquiry, my opinion is, that the original taint is not cured by the length of time elapsed, between the survey of 1769, and the order of 1775, to complete it. Wbat has great weight with me, is, that no innocent purchasers have been induced to purchase Nixon’s right. Now, without descending into the minutise of the charge, or cavilling at particular expressions, I do consider the manner in which it was finally left to the jury was erroneous, tending to mislead them; for, in conclusion, the judge directed the jury, “that if G. Nixon built a cabin in 1775 or 1776, he had a right to hold, if no prior right existed; that he returned after the war, and remained there until his death; that his daughter, to whom he devised it by his will, still continued to hold it, and that, if this settlement was made before M‘Pherson’s resurvey was executed or returned, or before Nixon had notice of it, he would be entitled to hold a pre-emption right, by a convenient designation; but if he had clearly fixed this claim on other lands, he could not come on this disputed ground; he could not hold eight hundred acres by a settlement.” The error lies here at the root of this position; in considering Nixon as entering simply as an actual settler, settling on vacant land, and claiming under a settlement right. That was not his situation; he entered not as a settler claiming to hold three hundred acres under his settlement right, but as a warrant holder, claiming under a warrant and survey of eight hundred acres, and so he continued to hold until the day of his death. He sold to Stone one hundred acres, which was patented on the warrant; he conveyed to his son. Thomas, one hundred and fifty-nine acres, on the 19th of January, 1801, who patented it on this right; he devised to his son John two hundred and thirty-six acres, and to his daughter, Young, the like quantity, on the 37th of January, 1806. When he makes his will, he devises the whole as one tract of land; the homestead place to his wife, during life; and, at his decease, to be divided between his daughter, Rebecca Young, and his son John; and John now holds two hundred and thirty-six acres, the half, under that will. Now, in the face of all these facts, it is impossible to give him the character of a settler. The effect of this would be, to enable him to hold eight hundred acres; *128 to reap the benefit of a fraudulent and void warrant and survey, and then, to serve another purpose, assume a new character, that of a settler on part of the eight hundred acre sui’vey, as vacant land. It cannot work both ways, nor be used as a two-edged instrument, to keep out all around. When Smith made the resurvey or addition for M‘Pherson, his direction was, to complete it as to quantity, provided there did not appear prior rights to the same. Now, if Nixon’s warrant and survey were fraudulent and void, the addition interfered with no prior right; and it is worthy of remembrance, that if the eight hundred acre survey was void, then Smith left land in abundance to fill Nixon’s settlement right, and even to fill his warrant, if the warrant was valid; and, if he had no other than a settlement right, he and his family can have no just cause of complaint for this error; more than twice the quantity, double settlement rights; and, if the settlement was after Nixon’s warrant, it .was before his survey, and the quantity of eight hundred acres could not be included in it, if it trenched on the tract which Palmer’s settlement right entitled him to. And, if the improvement right of Nixon commenced before the resurvey or addition, in 1775, then there was ample scope left for Nixon, under his settlement right; thus admitting, that the character of a settler belongs to him, and not that of a warrant holder.
I think, likewise, there was error in leaving it to the jury to decide, whether McPherson had applied in a reasonable time to have his survey completed. If there was fraud in Tea, in making a survey, including lands naturally falling to M‘Pherson, under the settlement right called for in his application, then nothing short of the limitation law, where the perpetrators of the fraud were to reap the benefit, would conclude him. Here there is, as I stated in the outset, no intervening right — no purchasers for a valuable consideration. The controversy is with those who enjoyed the benefit of the fraud, and for whose use it was committed; and, as was observed by the Chief Justice, in Davis v. Keefer, before referred to, in a similar controversy, the defendant cannot complain. of having suffered any injustice by the neglect; for they were not innocent purchasers. And the court, further says, — If there -was fraud in Tea, the owner ought to have sought relief without delay. There was no evidence of notice given to MiPherson of the fraud. When it was discovered, we know not. Even under the limitation law, the time would not begin to run,.until the fraud was discovered. No length of time will bar a fraud, where the interest remains in the person who committed it, or for whose use it was committed, short, at least, of some positive statutory provision. Talbot, 68. Sac. Tracts, 37. In equity, certainly, until the fraud is discovered, the statute does not begin to run; and the reason is, that the conscience of the party being affected, he ought not to be allowed to avail himself of the length of time, where *129 the party, by his own fraud, has precluded the other party from coming to a knowledge of his rights. Troup v. Smith, 20 Johns. 47. In equity, the limitation does not run, except from the time fraud is discovered. Here, I consider the act of Tea, in making the survey on the Nixon warrant, while he claimed the right to it, and the survey of M‘Pherson, not completing it, as the act of Níxoji. The fraud was committed'' in Nixon’s name, and for his benefit. There was no evidence of notice to MlPher-son. He would naturally conclude the surveyor had done his duty, completed his survey, or that there subsisted some previous right.
It does not, as the court instructed the jury, lie on the plaintiff to prove that McPherson did not assent. It would be incumbent on the person alleging his assent, to prove that he had notice of the act, and all the circumstances, and with that notice assented by his acquiescence. There was not a scintilla of evidence, that M‘Pherson had notice of this incomplete survey. If he had, and acquiesced in it, it is probable he would haye called on Tea to return it; and though the original draft was evidence to show the act done on the ground, yet the memorandum of Tea, that a copy had been sent to M‘Pherson, was no evidence to prove notice. It was a private memorandum, and not an official act. He could not make evidence for himself. I think, likewise, that too much stress was laid, on the delay in not returning the survey completed by Smith. This, in the contemplation of law, was a precise application. It did not, to be sure, amount to a survey; but calling for Palmer’s improvement, it described it with all reasonable certainty. It could not be laid on other land with propriety, and that is all the certainty that the law required. To make it a descriptive location, it is not required that it should be with all certainty. Davis’s Lessee v. Keefer, 4 Binn. 163. And, in Lauman v. Thomas, 4 Binn. 58, it was said by the Chief Justice, warrants descriptive of the land to be surveyed, are either precisely so, or with such reasonable certainty as is sufficient to designate it; and if due diligence is used in obtaining such survey, the title attaches from the date, and not from the return. This is the first class. The second is, where it fixes no precise spot, but allows a scope of several miles. The title does not attach until the survey is made. The third, are shifted wax-rants or locations, where title attaches fi-om the return of the survey, unless where a party has notice. And in the second class, — of loose warrants or applications, — which was the case befox-e the court, he observes, that the application was to ■be considered complete from the time of the survey, unless something improper afterwards took place on the part of the holder, as suffering a mau to settle and improve without notice of the survey, or permitting it to be surveyed for a third person; for,’ as he most justly says, the survey was made by the officer of the proprietary, whose duty it was to return it to the surveyor general’s officer, for *130 so he was commanded by the warrant. 4 If he neglected his duty, the purchaser is not to be injured by it. And this certainly is the law here with regard to loose locations; but how much stronger is it,' where the location is descriptive, with common reasonable certainty. All these rules, with respect to return of surveys, admit of exception, where there has been improper conduct on the part of the warrantee, affecting the owner of a subsequent right. Whatever doubts might be entertained, by some, of the principle as applied to lobse locations, where the location, as in this case, was descriptive, I never heard it questioned; for, as was further said in that case, if the warrantee has done every thing in his power, by putting his descriptive warrant into the hands of the surveyor, and procuring a survey to be made, great mischief would follow, if he might be cut out of his land, by the dishonesty of the surveyor in not making the return. Here no such imputation is intended to be cast on the memory of the most respectable gentleman, who made the addition on the order of 1775, (if, indeed, that order had not issued earlier.) Fewer controversies have arisen on surveys made by that most excellent man and fine officer, than have occurred in the case of any other deputy surveyor. But the war intervened; the fact of the additional survey was notorious; it was made by the direction of Captain Piper, who lived on the adjoining tract, to whom Mr. Woods referred Judge Smith, to show him the spot. I do not think it necessary to consider the exceptions further in detail. But, to prevent misapprehension, I do not understand the judge to have charged the jury, that an application precisely descriptive did not give title, but from' the time of the return. Taking the whole charge together, and construing it as , one whole, I do not think that was the meaning of the court. If it was, it would be far from being correct as a general proposition, though, in particular cases, the neglect of return might amount to evidence of abandonment, where the omission was the act of the warrantee, and operating injuriously to the right of others, who had, with the knowledge of the warrantee, made valuable improvements without notice; for .these rules, simple in their origin, and very general in their terms, must from their very nature, be subject to exceptions. The only-argument against the rule, is, where these persons are affected by the improper act of the warrantee himself, not by the neglect of the surveyor.
I am therefore, for this reason of opinion, taking into consideration all the circumstances of this very uncommon case, that the view taken of it by the court was erroneous, and would tend to mislead the jury, by taking the new ground, of Nixon being a settler in 1775, whose claim included the land in question, under his settlement right; whereas the proof was ineontrovertable, that G. Nixo7i entered, claiming eight hundred acres on his warrant, sold ■parts of it as his warranted land, settled the residue on his wife, and children, as his warranted and surveyed land, lived on it as his *131 surveyed land and died on it as his warranted and surveyed land; one undivided a tract of eight hundred acres, held by warrant and survey; and, on the trial of this cause, they put the warrant and survey in the very front of the battle, as their shield and defence. The heirs of George Nixon could not now patent it, and pay the purchase money, as on a mere settlement right, by abandoning the warrant and survey, if there was not an adverse claim, and would be bound to patent it on the old right, and pay the price and interest from 1762, and not interest from 1775; for this would be a fraud on the state.
Judgment reversed, and a venire facias de novo awarded.